**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **PEARSON'S INC. d/b/a PEARSON** | § | |
| **LIVESTOCK EQUIPMENT CO.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:18-cv-00013-BP** |
| | § | |
| **ROBERT DEAN ACKERMAN,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

On January 25, 2018, Pearson's Inc. d/b/a Pearson Livestock Equipment Co. ("Pearson"),

filed suit against Robert Dean Ackerman and Heather Ackerman Badley (collectively

"Ackerman") and Titan West, Inc. ("Titan") for trademark and trade dress infringement under the

Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, trade dress dilution under Section 16.103 of the Texas

Business and Commerce Code, and trade dress infringement under Texas common law. (*See*

*generally*, ECF No. 1). On February 16, 2018, Ackerman filed his Answer, Plea, and

Counterclaims. (ECF No. 12). Ackerman asserted counterclaims against Pearson for trademark

cancellation and antitrust violations. (*Id.*). Subsequently, Pearson nonsuited its claims against

Badley (ECF No. 18), and Ackerman's antitrust counterclaims were dismissed by agreement (ECF

No. 32). Before trial, Pearson settled its claims with Titan. (ECF No. 63).

The Court conducted a three-day bench trial on April 29, 30, and May 1, 2019. During the

trial, the Court heard testimony from Robert Dean Ackerman, Clint Newton, Ricky Rater, David

Rater, Van Neidig, Bret Hull, Cory Knight, Patrick Carhart, and Mark McKenna. By agreement of

the parties, the Court admitted in evidence Pearson's Exhibit Nos. 1-2, 62-64, 81, 82, and 90-107

and also admitted Ackerman's Exhibit Nos. 201-221, 223-228, 231-234, 236, 237, 246, and 248.

During trial, the Court admitted Pearson's Exhibit Nos. 6, 11, 17, 20, 23, 25, 27, 32, 36, 46-49, 52, 56-58, 65, 84, 85, 108 and Ackerman's Exhibit Nos. 222, 250, and 255. Demonstrative Exhibit Nos. 9, 256, and 257 also were admitted. Pearson withdrew Exhibit No. 89, and Ackerman withdrew Exhibit Nos. 200, 230, 238, 241, 245, and 247. After the trial concluded, Pearson and Ackerman timely submitted their proposed findings of fact and conclusions of law.

After considering the evidence and the arguments of counsel, and for the reasons set forth below, the Court finds that Pearson's mark is functional and nondistinctive. Thus, its trade dress and trademark ("Pearson mark" or "mark") are not legally protectable. Therefore, Pearson's registered trademark No. 5,184,202 is canceled pursuant to 15 U.S.C. § 1119. Additionally, Ackerman has not proven his fraudulent procurement claim by clear and convincing evidence. Nor has he proven the case is exceptional under 15 U.S.C. § 1117(a). Accordingly, his request for attorney's fees is denied.

## FINDINGS OF FACT

I.      **History of the Pearson Chute**

Pearson designs, manufactures, and sells products for use in the cattle industry. One of its products is the "Pearson Chute," a manual, parallel squeeze cattle chute that it has sold since the 1970s. The chute consists of a narrow, cubical framed structure that is wide enough to accommodate a single animal. The chute is designed to immobilize an animal by uniformly squeezing it from both sides, thereby providing easy access to the animal for examination and other procedures. (Pl.'s Exh. 2 at 159). Pearson protected the chute's functional features, including the squeeze mechanism and other features, through a series of utility patents issued by the United States Patent and Trademark Office ("PTO") in 1965, 1977, and 1982. (Pl.'s Exh. 2 at 150–55, 156–63, 164–68).

Over the years, the design and overall look of the Pearson Chute have evolved. The appearance of the modern-day Pearson Chute has remained substantially unchanged since the early 1990s, when circular disks were incorporated at opposite ends of the raised front crossbar and rear squeeze hinge orientated forward from its corner posts. (Transcript ("Tr.") Vol. 1 at 142; Defs.' Exh. 257).

A photograph of the modern-day Pearson Chute, without the squeeze handle in place, is shown below:



(Defs.' Exh. 246 at 193).

The original owners of Pearson sold the business to Ricky and David Rater in January 2013. (Tr. Vol. 2 at 50). Originally, Pearson only produced chutes in Thedford, Nebraska. Shortly after purchasing the business, the Raters expanded its manufacturing capabilities to Vernon, Texas. (*Id.* at 184). Ricky Rater is Pearson's Vice President and General Manager with overall responsibility for operations, and David Rater is Pearson's President with responsibly for banking,

marketing, and distributor relationships. (*Id.* at 185). David Rater is Ricky Rater's father. (*Id.* at 174).

Today, Pearson produces approximately 400 cattle chutes annually and sells anywhere from five to thirty-three percent of its chutes into the international market. (*Id.* at 54–56). Domestically, Pearson sells its products directly to consumers and through regional distributors who may or may not have local dealer relationships. (*Id.* at 54).

## II.    Pearson's relationship with Ackerman

Ackerman has been in the retail cattle equipment business for nearly forty years. (Tr. Vol. 1 at 180). His wife, Donna Ackerman, and daughter, Heather Badley, are employees of the business, which is located in La Salle, Colorado. (*Id.* at 178–80). In 1983, Ackerman began selling Pearson Chutes as a local dealer. (*Id.* at 180). From 1993 to 2014, Ackerman served as Pearson's exclusive regional distributor of Pearson Chutes for the Colorado Region of the United States. (*Id.* at 184).

The Pearson Chute is a popular, high-quality chute with a good reputation in the cattle industry. (*Id.* at 183; Tr. Vol 2 at 12). Although distributing the Pearson Chute had been fairly profitable, Ackerman wanted to sell a more economical chute that functioned like a Pearson Chute, but without the price and geographical restrictions imposed by Pearson. (*Id.* at 186–87; Tr. Vol. 3 at 115–16). Ackerman's idea was not new. Since the 1990s, after Pearson's utility patents expired, other manufacturers of cattle chutes began incorporating aspects of the Pearson Chute's design, mimicking its function and shape. (Tr. Vol. 2 at 14, 74–83, 138–40; Defs.' Exh. 256). However, aside from the chutes co-developed by Ackerman, there is little evidence to establish the market success and adoption of these third-party competitors throughout the cattle chute industry. (*See* Tr. Vol. 2 at 74–83, 141–43).

Ackerman and WW Manufacturing ("WW"), one of Pearson's competitors, developed a new cattle chute called the Next Generation Beefmaster ("Beefmaster"). (Tr. Vol. 1 at 187–90). WW already manufactured a cattle chute called the Stampede that incorporated many of the design features comprising the Pearson Chute. (*Id.* at 187, Tr. Vol. 2 at 15–16). As a result, the Stampede resembles the Pearson Chute, but is substantially heavier and contains additional design features making it a more expensive cattle chute than what Ackerman wanted to sell. (*Id.*; Tr. Vol. 2 at 6). To aid WW in designing a more economical chute, Ackerman sent a Pearson Chute to WW. (*Id.*). Ackerman asked WW to implement specific features of the Pearson Chute, the circular disks and removable wings or side panels, into the Beefmaster's design. (*Id.* at 190–91; Tr. Vol. 2 at 16–17).

The circular disks allow the chute to operate as either a left- or right-handed chute and permit a user to orient the squeeze handle attached to the disk in multiple directions. (Tr. Vol. 2 at 16–19; Tr. Vol. 3 at 117; *See* Pl.s' Exh. 2 at 53, 141, 146). The circular disks' functionality, combined with the raised front crossbar and squeeze handle, provide both safety and operational benefits. (*Id.* at 16–19, 115–16; Tr. Vol. 3 at 117; *See* Pl.s' Exh. 2 at 53, 141, 146). The combination allows a user to orientate the squeeze handle to the position and stature of the user, thereby providing extra leverage and promoting safety by keeping a user out of harm's way in the event of any unforeseen release of the animal inside the chute. (*Id.* at 16–19; Tr. Vol. 3 at 117). The removable side panels allow for easier access to the animal once it enters the chute. (Pl.s' Exh. 2 at 53).

Pearson learned that Ackerman sent a Pearson Chute to WW. (Tr. Vol. 1 at 191). David Rater telephoned Ackerman on or about March 20, 2014 to confront him about sending the chute to WW to be "copied." (*Id.* at 193). Ackerman confirmed he sent a Pearson Chute to WW and understood that Pearson did not want him copying any Pearson Chute design features into any

other competing chutes. (*Id.* at 195). On the call, David Rater terminated Ackerman as a Pearson distributor. (*Id.*; Tr. Vol. 2 at 195).

### III.  Ackerman competes with Pearson

Ultimately, the Beefmaster was unsuccessful. (Tr. Vol. 2 at 20). Undeterred, Ackerman developed a relationship with another chute manufacturer called Pro Farm Manufacturing, Inc. ("Pro Farm"), a Canadian company with manufacturing capabilities in China. (Tr. Vol. 1 at 201, 204–05). Ackerman's wife first saw a Pro Farm chute at a cattle equipment auction. (*Id.* at 201–02). At the time, the Pro Farm chute was painted a green color.(*Id.* at 202–03; Pl.s' Exh. 6). But it had many of the same features of a Pearson Chute, including the raised front crossbar, circular disks, and squeeze handle. (*Id.* at 213). On or about March 18, 2014, Ackerman accompanied his wife to the auction to collect equipment she had purchased. (Tr. Vol. 3 at 119). While there, he saw the Pro Farm chute and remarked that it looked like a Pearson Chute. (*Id.* at 120; Tr. Vol. 1 at 213).

Days after David Rater terminated Pearson's distributorship, Ackerman contacted Pro Farm about distributing the Pro Farm chute. (Tr. Vol. 1 at 201). After Pro Farm sent Ackerman his first order of Pro Farm chutes, a representative from Pro Farm visited Ackerman in La Salle, where the representative saw a Pearson Chute. (*Id.* at 206). Much like his experience with the Beefmaster, Ackerman helped develop the Pro Farm chute for the domestic market. (*Id.* at 209–10). Ackerman rebranded the Pro Farm chute to be named the Renegade; instructed Pro Farm to change the color of the Renegade from green to gray; advised Pro Farm on how to improve the chute; and advertised the gray Renegade chute. (*Id.* at 204, 214–15, 217; Pl.s' Exh. 11, 36, 65). As a result of Pro Farm and Ackerman's joint development, the Renegade Chute looks very similar to the Pearson Chute, as shown below.





Pl.'s Exh. 58 (Renegade Star).



(Defs.' Exh. 246 at 193) (Pearson Chute).

Ackerman distributes the majority of Pro Farm's Renegade chutes that are sold in the United States. (*Id.* at 211). From early 2014 through May 2018, Ackerman sold approximately 244 Renegade and eight Equalizer chutes. (*Id.* at 225–26). The Equalizer is a cattle chute manufactured by Titan. For unknown reasons, Ackerman allowed Titan to copy the Renegade chute. (*Id.* at 219). Ackerman went so far as to request that Titan incorporate the circular disks found on the Pearson Chute into the Equalizer's design. (*Id.*). A review of the Equalizer confirms that it is nearly identical to the Pearson Chute. (*Id.* at 66, 76; Pl.s' Exh. 3).

As a result of Ackerman's actions in co-developing the Beefmaster and actively competing against Pearson with the Renegade, Pearson filed for trademark registration on September 17, 2014 to protect the shape of the Pearson Chute. (Tr. Vol. 2 at 109). A week prior to filing its trademark application, Pearson mailed to Ackerman a cease and desist letter demanding that he stop using Pearson's logo and name on his website. (*Id.* at 36, 103, 146). The cease and desist letter did not demand that Ackerman stop producing the Renegade or stop copying the shape of the Pearson Chute. (*Id.*). Ackerman stated it was clear to him from his conversation with David Rater

terminating him as a distributor that Pearson did not want him to incorporate features of the Pearson Chute into other chutes. (Tr. Vol. 1 at 195). However, Ackerman did not understand the Pearson Chute could be trademarked, especially in light of other chutes that incorporated features of Pearson's mark like the 2W Wrangler and WW Stampede. (Tr. Vol. 2 at 36; Tr. Vol. 3 at 118).

Pearson did not inform Ackerman that the Renegade potentially infringed the Pearson mark until Pearson filed suit in this case in January 2018. (Tr. Vol. 2 at 38, 146). After that time, Ackerman began producing and marketing the Renegade Star, another model of chute. (*Id.* at 38–40). The only difference between the Renegade and Renegade Star is that the latter has a star-shaped metal plate in place of the circular disk. (*Id.*). Even with the star plate affixed, the circular disk outline is still present. (Tr. Vol. 1 at 225; Pl.s' Exh. 58).

## IV.    Distinctiveness and Confusion

The Pearson Chute's design has remained largely unchanged since 1993. (Tr. Vol. 1 at 142). Although Pearson did not offer any evidence of the number of chutes it sold after 1993, consumers and distributors of cattle chutes generally recognize a Pearson Chute. Testimonials presented to the PTO during prosecution of the Pearson mark showed that customers recognized the Pearson Chute. (Pl.s' Exh. 2 at 141–48). However, it is unclear whether the entire mark; individual features of the mark such as the circular disks, raised front crossarm, gray color, or removable side panels; or some combination of features is what they identify as the Pearson mark. Pearson also did not offer any consumer survey evidence to substantiate what features of the Pearson mark are recognizable in the marketplace.

Ackerman, himself, exclaimed upon seeing the Pro Farm chute that it looked like a Pearson Chute, except that it was green instead of gray. (Tr. Vol. 1 at 213). Van Neidig,[1] a cow-calf operator and designer of several cattle chutes, testified the Renegade was a direct copy of the Pearson Chute, but manufactured at substantially lower quality. According to Neidig, Ackerman copied the arrangement of the raised front crossbar, circular disks, and squeeze handle combination from the Pearson Chute. He described how the Pearson Chute has a good reputation in the industry and is of higher quality than the Renegade. The differences between the Renegade and Pearson Chute are weight, size of material, and quality of construction.

Bret Hull,[2] a longtime cattle rancher who mainly uses a chute manufactured by WW, also stated the Pearson Chute has a recognizable shape, specifically noting the raised front crossbar and circular disks. Hull described the look as a "praying mantis," recognizable from 300 yards away. Further, he noted that the gray color of the chute is distinctive to Pearson, and the basic design has not changed for the last twenty-five years. Hull also testified that he first saw a Renegade at a trade show two years earlier and was surprised to see that it was virtually identical to the Pearson Chute, specifically the raised head gate, parallel chute frame, raised circular disks, tail gate, and color. Notwithstanding the similarities, Hull was able to distinguish the Renegade from a Pearson because of its weight and quality of construction.

Ackerman offered the testimony of Patrick Carhart, retired WW national sales manager. (Tr. Vol. 3 at 36). Carhart worked in the agricultural equipment industry for forty-five years before his retirement on January 1, 2016. (*Id.* at 36, 38). During his career, he sold chutes for various manufacturers and was WW's sales representative from 1995 until being promoted to national

---

[1, 2] Van Neidig's and Bret Hull's testimony was offered by pre-recorded video deposition and apparently was not transcribed. Their deposition transcripts were not offered in evidence or filed by the parties. However, the Court reviewed the audio recordings of their video deposition trial testimony in preparing the Findings of Fact.

sales manager in 2004. (*Id.* at 37). He testified that there were around two dozen parallel squeeze chutes on the market when he retired. (*Id.* at 38). He stated that the Pearson Chute is recognizable because of its parallel squeeze function. (*Id.* at 40–41). Further, because there are similarities between parallel squeeze chutes, it would be hard to identify a Pearson Chute from a line-up of other parallel chutes. (*Id.* at 40). He testified that the Pearson Chute is distinguishable from other parallel chutes because of its "pull-out sheet," a reference to the removable side panels. (*Id.* at 44, 49). He also stated that although the color of a chute is an indicator of the manufacturer, there are multiple chutes using a gray color, and there is nothing special about the shade of gray used by Pearson. (*Id.* at 41). When asked if he could distinguish a Pearson from the other chutes he had sold or was familiar with during his career, Carhart responded in the affirmative. (*Id.* at 49).

Traditionally, cattle chutes are advertised in print and at trade shows, and more recently, on the internet. (Tr. Vol. 2 at 3, 52, 57–58). Manufacturers display the functionality of their chutes through demonstrations with live cattle at trade shows. (Tr. Vol. 3 at 124). In September 2014, at the Husker Harvest Days trade show in Nebraska, industry representatives and participants confused the Renegade with the Pearson Chute at one such demonstration. (Tr. Vol. 2 at 42–43). Ackerman took two Renegade chutes to the Husker Harvest trade show. (*Id.* at 44; Tr. Vol. 3 at 121–22). Participants at the show remarked how the Renegade looked like a Pearson Chute. Initially, show officials prevented Ackerman from demonstrating the Renegade, thinking it was a Pearson Chute. (*Id.* at 45). After Ackerman explained that he was marketing the chute as a Renegade and not a Pearson Chute, he was allowed to demonstrate the Renegade. (Tr. Vol. 3 at 123). Later, at the Dakota Fest trade show, consumers who had purchased a Pearson Chute and needed replacement parts, initially confused the Renegade for a Pearson Chute. (Tr. Vol. 1 at 223; Tr. Vol. 2 at 73, 100; Pl.s' Exh. 52). Ackerman clarified the confusion.

The Raters anecdotally discussed how consumers on Facebook.com and at trade shows remarked that the Renegade and Pearson Chute look similar. (Tr. Vol. 2 at 96, 99–100, 103, 198). An email from a Pearson customer asked Ricky Rater about Ackerman's website advertisement of the Renegade, questioning whether it was a Pearson Chute. (*Id.* at 97–98; Pl.s' Exh. 81). In the same email, the customer understood that Ackerman had previously been a Pearson distributor. (*Id.*).

Consumers confused not only the shape, but also the color of the Renegade with the Pearson Chute. And, at least one consumer purchased a Pearson Chute after finding the Renegade was of lower quality. (Tr. Vol. 3 at 125–26). Although Ackerman used Pearson's name as a metadata tag in his website, aside from nonspecific, anecdotal comments made by the Raters, Pearson offered no persuasive evidence to establish that any consumer purchased a Renegade thinking it was a Pearson Chute. (Tr. Vol. 1 at 134; Tr. Vol. 2 at 32, 170–71). The Raters did not specify or generally discuss how many more Pearson Chutes would have been sold but for the existence of the Renegade and Equalizer chutes in the cattle chute market.

## V.     Quality Issues

The Raters testified that due to quality concerns related to the Renegade, Pearson's reputation had been damaged, though their testimony regarding the amount was speculative at best and was not sufficient to support an award of damages. No expert quantified the impact or damage to Pearson. The Renegade encountered quality control problems as a result of Pro Farm's manufacturing inconsistencies. (Tr. Vol. 1 at 228–29). Because of these inconsistencies, Ackerman had to rework or repair nearly every Pro Farm chute he received before selling them. (*Id.* at 228–29). The Renegade chutes as received from Pro Farm were basically unsellable before Ackerman reworked them. (*Id.* at 229). Ackerman even characterized some of the chutes as unsafe. (*Id.* at

230). Neidig testified that during trade show demonstrations of the Renegade, the chute malfunctioned, and participants in the trade show steered clear of the Renegade. Although Ackerman reworked defective Renegade chutes before selling them and provided customers with replacement parts and services, Pro Farm's manufacturing problems negatively affected the Renegade's reputation for quality. (Tr. Vol. 1 at 227; Tr. Vol. 2 at 11, 109–10, 200–01).

## VI.    Pearson obtains trademark registration over elements of the Pearson Chute

### A.    The registered trademark

On September 17, 2014, several years after the Pearson Chute's patents expired, and shortly after the Husker Harvest Days trade show, Pearson applied for trademark registration with the PTO. After the PTO limited the scope of the mark, Pearson received trademark registration in the principal register (Registration No. 5,184,202) on April 18, 2017. Below is an illustration of the Pearson mark (highlighted for ease of reference):



(Pl.'s Exh. 2 at 12). Pearson's trademark covers the following features:

> The mark consists of a three-dimensional configuration of a cattle chute, specifically having four vertical corner posts extending upwardly from a rectangular base, parallel upper side rails that connect front and rear corner posts, a rear cross arm connecting the upper side rails adjacent the rear cross arm, a raised

front cross arm connecting the front vertical posts and having extensions extending rearwardly therefrom and circular disks on opposite ends, a squeeze handle extending upward from one of the disks of the front cross arm, upper and lower front squeeze hinge arms extending rearward from the front corner post, and the upper and lower rear squeeze hinge arms extending forward from the rear corner post.

(*Id.* at 4). Color was specifically disclaimed by Pearson and is therefore not part of the trademark. Nor does Pearson explicitly claim color as part of its trade dress.

**B.    Prosecution of the Trademark**

Because prosecution of the trademark is at issue, a summary of the prosecution history, supporting evidence, and arguments made during prosecution are described below. The summary is based on the trademark file wrapper. (*See generally* Pl.'s Exh. 2 and Defs.' Exh. 246).

*1.    The PTO's Initial Rejection and Pearson's Response*

The Trademark Examiner ("Examiner") initially rejected Pearson's application because it appeared to be functional and nondistinctive, and the illustration of the trademark did not match the specimen provided by Pearson. In explaining the initial rejection, the Examiner listed several competing chutes with similar functional features, including the Stampede and Renegade chutes. Pearson responded to the Examiner's functionality rejection. It argued that (1) because the Examiner is not a consumer of cattle chutes, what may appear similar to a normal person would not be similar to a cattle chute consumer; (2) the competing chutes listed, though they may function similarly, do not incorporate the Pearson Chute's shape; and (3) the Ackerman chute is a direct copy of the Pearson Chute. In response to the distinctiveness rejection, Pearson argued it had sold the Pearson Chute for over fifty years and highlighted the raised front crossbar as a feature not incorporated by the competing designs listed by the Examiner.

The Examiner again issued a rejection of Pearson's trademark application. The Examiner rejected Pearson's non-functionality argument because the illustration did not indicate which features of the mark did not have utilitarian advantages, and Pearson's website indicated utilitarian benefits of the Pearson Chute's design. Further, the Pearson website informed her of undisclosed utility patents, which covered aspects of the mark. The Examiner also continued her distinctiveness rejection due to insufficient evidence the mark had acquired distinctiveness. She also included a new rejection under Section 2(f) for insufficient evidence of substantially exclusive and continuous use in commerce for more than five years. Moreover, the Examiner rebutted Pearson's argument that the raised front crossbar was exclusive to Pearson, citing examples of competing chutes she listed in the first office action rejecting the application. The Examiner also continued her rejection that the illustration did not match the specimen provided. Because the Examiner added a new ground for rejection, the second rejection was not made final.

Unlike Pearson's previous response to the Examiner's rejection, its response to the Examiner's second rejection contained a persuasive, detailed brief with (1) an annotated illustration highlighting the claimed features of the mark, (2) testimonials from customers and a competitor discussing the benefits and recognizability of the Pearson Chute; (3) copies of the expired utility patents relevant to the Pearson Chute, (4) examples of Pearson's advertisements made over the years, and (5) annotated alternative designs employing similar features of the mark.

As originally filed, Pearson's application attempted to trademark the entire arrangement of the Pearson Chute. In response to the Examiner's rejection, Pearson disclaimed many features of the Pearson Chute and focused its application on specific features, which it argued were not claimed or described in its patents and did not preclude others from producing alternative parallel

squeeze chute designs. Other than evidence of alternative designs, Pearson did not present any evidence to establish how the claimed features were merely ornamental, incidental, or arbitrary aspects of the Pearson Chute. As to distinctiveness, Pearson resubmitted its prior argument that the mark, as now claimed, had acquired distinctiveness. To bolster this argument, Pearson directed the Examiner to seven testimonials showing how customers recognized the Pearson Chute. Many of these testimonials state that some of the features are uniquely Pearson, but in the same statement, describe the utilitarian advantages of the same features. Other testimonials describe how the gray color of the chute distinguished the Pearson Chute from others, ambiguously refer to the shape of the Pearson Chute, or discuss features of the chute not claimed in Pearson's application. A testimonial from Neidig, who claimed to be a competitor of Pearson, touted the recognizable, unique features of the Pearson Chute. Pearson also submitted a new substitute specimen. In total, Pearson's arguments contained in the response were primarily directed toward the Examiner's rejection for functionality.

### 3. The PTO's Final Rejection and Pearson's Request for Reconsideration

On April 16, 2016, The Examiner issued a final office action rejecting Pearson's application because of functionality, nondistinctiveness, and the illustration of the trademark did not match the specimen provided by Pearson. The Examiner rejected Pearson's functionality argument citing to *In re Morton–Norwich Prods., Inc.*, 671 F.2d 1332 (C.C.P.A. 1982). She concluded the patents disclose and advertising touts utilitarian advantages of the Pearson Chute, and that alternative designs include the same or similar features of the Pearson Chute. Moreover, the testimonials described functional aspects of the Pearson Chute's design. The Examiner also rejected Pearson's distinctiveness argument. The Examiner noted that although some features of the Pearson Chute were present in the alternative designs, the testimonials describe how the gray

color distinguished the Pearson Chute from others, and that the advertisements did not describe non-utilitarian advantages of the Pearson Chute. Finally, the Examiner continued her rejection based on the specimen not matching the illustration.

Because the Examiner issued a final rejection, Pearson submitted a detailed Request for Reconsideration in response including (1) an amended drawing, (2) copies of the expired utility patents relevant to the Pearson Chute, (3) the declaration of Ricky Rater, signed as Secretary and Director of Pearson, and (4) a substitute specimen photo. In response to the Examiner's final rejection for functionality, Pearson again reiterated its argument the mark is not functional citing to the *Morton-Norwich* factors. Notably, Pearson argued for the first time that the claimed features along with their shape, arrangement, and relation to each other, as a whole, were what Pearson was attempting to trademark, and that the patents neither claimed the shape nor was the shape dictated by any utility claimed in the patents. Pearson also argued that it specifically disclaimed from the trademark any features disclosed in the patent. Further, Pearson argued that even if some of the trademarked features were disclosed in the patents, their arrangement was not dictated by function. Pearson also countered the Examiner's argument that the advertisement touted utilitarian advantages of the Pearson Chute by pointing out that none of the advertisements stated that the advantages were because of the design. Finally, Pearson argued that the availability of alternative designs established that no competitor would bear a significant disadvantage if the PTO were to issue the trademark because the shape of Pearson's mark was not required to produce a competing chute, nor would competitors be economically disadvantaged.

In response to the Examiner's rejection for nondistinctiveness, Pearson reiterated that the Examiner must analyze distinctiveness from the perspective of cattle chute consumers and reasserted that record evidence established the Pearson Chute was distinctive and well-known in

the industry. Pearson further argued that the Pearson Chute's design acquired distinctiveness by distinguishing the testimonials in light of the Examiner's prior rejection. Additionally, Pearson significantly expanded its argument from the first response that the Pearson Chute was the target of intentional copying. Citing Ricky Rater's declaration, Pearson discussed the circumstances leading to Ackerman's deliberate attempt to confuse customers and use Pearson's goodwill to his benefit. Pearson's response also highlighted the testimonial from Neidig who characterized the Renegade as an attempt to copy and confuse customers.

In sum, although Pearson made similar arguments concerning functionality and distinctiveness, the Request for Reconsideration incorporated stronger and more pointed arguments to the Examiner's reasons for rejecting its trademark application. Thereafter, the PTO issued Pearson's trademark on the Principal Register on April 18, 2017. Neither the PTO nor the Examiner described which arguments made in Pearson's Request for Consideration convinced the PTO to issue the trademark.

## VII. Functionality of the mark

### A. Evidence of Functionality

It is undisputed that every feature of the Pearson Chute has a functional purpose and that the chute will not function properly without each feature. (Tr. Vol. 2 at 116–17). Further, the Pearson Chute's simple design makes the chute easier and safer to use. For example, the combination of the raised front crossbar, circular disks, and attached squeeze handle allows for operation of the chute from either side by users with varying heights and unobstructed access to the chute, thereby making it safer and easier to operate.

Neidig testified that Akerman copied the arrangement of the raised front crossbar, circular disks, and squeeze handle combination from the Pearson Chute, and there was no functional reason

why a cattle chute needs to be arranged exactly the same way. He explained that some of the chutes he designed actuate the squeeze mechanism in a different manner. However, Neidig also testified that the placement of the circular disks with multiple holes along the periphery allows the squeeze handle to be adjusted by the user of the chute, promoting leverage in operating the chute. Further, the crossarm's and squeeze hinges' placement promote the chute's structural integrity. Those items along with other features of the Pearson mark are all "inherent" to performance. Notwithstanding these statements, according to Neidig, other parallel squeeze chutes function without mimicking the Pearson mark.

Like Neidig, Hull stated that everything in the Pearson Chute has a function and the chute would not function properly without each feature. Hull also explained benefits of the Pearson Chute design. For example, the raised front crossbar confers a safety benefit by making it less likely for head injuries when compared to the WW chutes he uses. Moreover, the ability to change the angular orientation of the squeeze handle around the circular disk provides a user more or less leverage in actuating the parallel squeeze chute mechanism.

However, neither party presented any persuasive evidence to establish the mark affects the cost of the chute.

**B.    Pearson's expired utility patents**

Pearson received three utility patents covering the Pearson Chute. (Pl.'s Exh. 2 at 64–71). They are patent numbers 3,221,707 (Automatic livestock head gate) issued December 7, 1965, 4,027,629 (Livestock Squeeze Chute) issued June 7, 1977, and 4,324,206 (Panel Mounted Arrangement for Squeeze Chute) issued April 13, 1982. The Examiner specifically identified the '629 and '206 patents as depicting the Pearson trademark.

Pearson's trademark counsel, Clint Newton, testified generally that Pearson's expired utility patents did not claim the features Pearson sought to protect in its trademark application. (Tr. Vol. 1 at 53–59). Newton explained that by disclaiming the functional features claimed in the patents, the "guts that's in between . . . the outline of [the] mark," the nonfunctional frame is protectable as a trademark. (*Id.* at 55). He further explained that the Pearson Chute's frame, although referred to in the claims' preamble and described in the patents, did not necessarily need to be the same size and shape as illustrated in the patent for the chute to function. (*Id.* at 57–58). Newton discussed alternative designs depicting squeeze chutes that function with different frames. (*Id.* at 58). Although Newton remarked these alternative designs were parallel squeeze chutes, he did not offer an opinion as to whether they functioned the same or similarly to the Pearson Chute. Further, there is no evidence from an expert discussing the operability of these alternative designs and the Pearson Chute.

Newton discussed how the '629 patent discloses a "frame" in the preamble of the patent claims and that normally terms in the preamble of a claim are not limiting on the claimed invention. Claims 1 and 2 of the '629 patent state "a livestock squeeze chute having a frame and laterally spaced sides supported on said frame . . . ." (Pl.s' Exh. 2 at 162–63). On cross examination, Newton discussed how features of the Pearson mark were disclosed in the patent, for example: (1) the upper and lower mounting brackets (the squeeze hinges) allowing for rotation of the side panels and (2) the claims disclose "operable" means, such as the raised handle, to release the chute. (Tr. Vol. 1 at 104–05). When asked if his argument to the Examiner during prosecution was essentially that the shape of the Pearson Chute was arbitrary even if each feature was functional, Newton did not directly answer the question and instead stated that "the shape did not have to be that [particular] shape in order to function as a cattle chute." (*Id.* at 105–06).

19

Contrary to Newton's assertion, a review of the '629 patent provides clarity for the shape of the "frame" and other features of the Pearson mark. In the Background and Summary section of the '629 patent, Pearson discusses that it is important for "the width of the chute as the animal enters is uniform throughout its height and is not restrictively narrow at the bottom or elsewhere so as to discourage the animal from entering." (Pl.'s Exh. 2 at 159). In the Detailed Description of the '629, every feature of the Pearson mark is identified. The frame's base is described as rigid and rectangular. (*Id.*). The patent discloses that the frame provides support for the chute to squeeze to and away from each other. (*Id.* at 160, 162–63 (Preamble of Claims 1 and 2)). The patent also describes the four vertical posts (front and rear corner posts) as welded at opposite ends of the rear and forward angle sections of the frame. (*Id.* at 159). The rear posts are cylindrical, upright, and parallel to one another and connected by a cross member (rear cross arm). (*Id.*). The front vertical posts are upright and connected to rear vertical posts by horizontal members (upper side rails) somewhat below the top ends of the posts. (*Id.*). The front posts are connected by a combination of sleeves that are welded on top of each front post with a rotatable shaft fitted though the sleeves (raised front crossarm). (*Id.* at 161). Each end of the shaft is fitted with a rectangular flange (instead of a circular disk). (*Id.*). Each flange end can be fitted with a crank arm (squeeze handle) to operate the chute, making the chute operable "from whichever side of the chute is desired." (*Id.*).

The patent also describes the front and rear squeeze hinge arms. Each front post also functions as a vertical axis along which a tubular post rotates. (*Id.* at 160). The tubular posts have parallel, upper and lower arm members (front squeeze hinge arms) attached. (*Id.*). Similar rear hinge squeeze arms are attached to another cylindrical post, just forward from the rear vertical posts. (*Id.*). Together, the front and rear squeeze hinge arms support the parallel squeeze's function

to move toward and away from one another. (*Id.*). Similar to the trademark, the front squeeze hinge arms extend rearwardly. (*Id.*).

The '629 patent is more precise than the trademark. For example, the patent describes the squeeze hinge arms as parallel, equal in length, and at the same height. (*Id.*). The trademark only describes which way the arms extend. In a similar vein, there are only two differences in the '629 patent's description of the Pearson Chute when compared to the mark, namely the rectangular flange on the crank arm and the rearwardly extending squeeze hinge arms.

## VIII.   Fraudulent Procurement

Ackerman seeks to invalidate Pearson's mark by claiming it was fraudulently procured. To support his position, he called an expert in trademark law, Professor Mark McKenna, to challenge statements in Ricky Rater's declaration and Neidig's testimonial.

### A.      Ricky Rater's Declaration

Pearson's Request for Reconsideration cited Ricky Rater's declaration of October 17, 2016, as evidence of intentional copying by Ackerman and to support Pearson's substantially exclusive and continuous use of the trademark. (Pl.'s Exh. 2 at 64–71). At the end of the declaration, Rater declared that "all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true . . . ." (*Id.* at 71). None of the statements made in the declaration are qualified as made on information and belief. However, paragraph 38 states he is "authorized to execute this affidavit on behalf of the Applicant corporation." (*Id.* at 70). The declaration also states that the Pearson Chute's design has become distinctive "as a result of substantially exclusive and continuous use in interstate commerce for well in excess of the five years . . . ." (*Id.*).

Ricky Rater's declaration concerning intentional copying states that "a distributor," referring to Ackerman, had an "exact copy [of the Pearson Chute] made so he could . . . keep selling the recognizable chute." (*Id.* at 67). The declaration further describes the distributor's relationship with a Chinese manufacturer that produced the allegedly infringing chute and that Akerman was motivated to create a lower-priced, but recognizable version of the Pearson Chute. (*Id.* at 67–68). At trial, Ricky Rater testified to the source of these statements. Although none of his statements in the declaration are qualified, he testified that his statements describing the Renegade as an "exact copy" and describing Ackerman's intent were based on a conversation he had with his father, David Rater. (Tr. Vol. 2 at 123–24, 179). Ricky Rater testified that in developing the declaration, he expanded his personal knowledge of the statements by investigating and researching them, including talking to his father. (*Id.* at 179). David Rater conveyed to Ricky his impression of the conversation he had with Ackerman about sending the Pearson Chute to WW. (*Id.*). Ricky Rater did not personally discuss the issue with Ackerman. (*Id.* at 123).

As for continuous use, the declaration states that the "unique design and appearance that is the subject of the present application" has been incorporated into Pearson cattle chutes since 1973. (Pl.'s Exh. 2 at 65). However, the Pearson Chute's design has changed over time, most notably the circular disk feature that was implemented sometime in the early 1990s, and the trademark file wrapper contains varying depictions of the Pearson Chute without all the features of the mark. (Pl.'s Exh. 170–76). However, the evidence presented by Ackerman indicates Pearson's mark has remained substantially unchanged since 1993.

On the issue of substantially exclusive use, the declaration states in paragraph 30 that the "Use of the subject design has, until recently, not only been substantially exclusive, including long after expiration of any of the patents, but has been exclusive." (Pl.'s Exh. 2 at 69). The next

paragraph of the declaration clarifies paragraph 30 by stating, "Even with the aforementioned recent knockoff, Applicant's use . . . has been substantially exclusive . . . ." (*Id.*). Further, Ricky Rater testified that he was referring to Ackerman's Renegade design as the recent knockoff. (*Id.* at 125). During prosecution, the Examiner highlighted the Renegade and other chutes as being in the marketplace and that they used elements of Pearson's mark. Pearson admits that "copies" of the Pearson mark, such as the 2W Wrangler in the 1990s, the WW Stampede in the 2000s, and the Beefmaster, not to mention the Renegade, predate filing of the application. (*Id.* at 138–39, 157). However, there is little evidence, aside from the Renegade, as to the extent of any third-party use of Pearson's mark.

### B.     Professor McKenna's testimony

Professor McKenna, the John P. Murphy Foundation Professor of Law at the Notre Dame Law School, whose area of expertise is trademark law, testified on behalf of Ackerman about the previously mentioned statements made by Ricky Rater. (Tr. Vol. 3 at 53). He testified that because Ricky Rater's declaration was the only piece of new evidence presented in Pearson's Request for Reconsideration, the PTO found the declaration persuasive and allowed the trademark. (*Id.* at 61–63).

McKenna opined that Ricky Rater's declaration contained material misstatements made with the intent to deceive the PTO. Those statements are: (1) Ackerman produced an "exact" copy of the Pearson mark; (2) Ackerman made those copies with the intent to profit from Pearson's reputation; and (3) the statements were made from personal knowledge, even though Ricky Rater did not have any communication with Ackerman. (*Id.* at 63–64). McKenna testified that the statements were material because but for those statements the PTO would not have issued the trademark. (*Id.* at 65). McKenna testified that he reviewed David Rater's deposition testimony and

concluded Ricky's statements were false because Ackerman never used the word "copy" for the purposes of trying to appropriate Pearson's goodwill. (*Id.* at 81–82). When asked by Pearson's counsel, "what is the fraudulent statement . . . ?," McKenna acknowledged the "more specific" purportedly false statement to the PTO was that Ricky Rater had personal knowledge that Ackerman intentionally copied the Pearson Chute for the purpose of appropriating Pearson's goodwill. (*Id.* at 84–85). Even though McKenna acknowledged Ricky Rater did not use the words "personal knowledge" in the declaration and made the declaration on behalf of Pearson's Inc., McKenna concluded, based upon his reading of the declaration, that Ricky Rater made the statements as an assertion of fact based on Ricky Rater's own belief. (*Id.* at 87–92). McKenna inferred intent on the part of Ricky Rater because David Rater actually had the relevant conversation, and Ricky Rater knew he did not have personal knowledge of the conversation. (*Id.* at 102–104). McKenna stated that David Rater was the proper person to have made the declaration. (*Id.* at 101).

### C.    Neidigs' testimonial statement

Pearson's trademark counsel cited Neidig's testimonial in the Request for Reconsideration as evidence of intentional copying by Ackerman. Additionally, Neidig stated he had competed with Pearson for thirty-seven years. Neidig manufactures and sells a competing parallel squeeze chute. Although a competitor to Pearson, Neidig also shares an undisclosed financial interest with Pearson and described his relationship with Ricky Rater as a friendly business association. (Tr. Vol. 2 at 159).

Neidig and Pearson collaborated together on the contents of Neidig's testimonial before submitting it to the PTO. (*Id.* at 159–60). At trial, Neidig recounted its contents and stated he "dismissed" the Renegade early on and now has "disgust" for it. He described the Renegade as a

"piece of junk" with no value, and Ackerman is like P.T. Barnum selling into a market where a "sucker is born every minute." Neidig believes Ackerman's development and marketing of the Renegade at a lower price and quality take advantage of consumers.

### D. Carhart's testimony

As WW's national sales manager, Carhart was familiar with Ackerman. Although he did not participate in developing the Beefmaster chute's design, his involvement included ensuring the Beefmaster was functional, practical, and properly priced. (Tr. Vol. 3 at 42). He stated the primary purpose of the Beefmaster was to bring down the cost of the Stampede and that neither Ackerman nor WW intended to copy the Pearson Chute's shape. (*Id.* at 42–44). He specified that WW wanted to adopt Pearson's wings (the removable side panels) because they were more economical to manufacture and operated smoothly. (*Id.* at 44).

## CONCLUSIONS OF LAW

Pearson has sued Ackerman for trademark and trade dress infringement under the Lanham Act and for statutory trade dress dilution and common law infringement under Texas law.

### I. Infringement

The Lanham Act provides that a party may protect a trademark by registering it with the PTO. 15 U.S.C. § 1051. A certificate of registration is *prima facie* evidence of a trademark's validity, registration, and ownership, and of the owner's exclusive right to use the trademark in commerce. *Id.* §§ 1057(b), 1115(a). A claim for trademark infringement requires proof that: (1) the disputed trademark is protectable; (2) it is owned by the plaintiff; and (3) there is a likelihood of confusion between the marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010).

"Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Id.* at 251 (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998) (internal quotation marks omitted), *abrogated on other grounds by*, *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32–33 (2001)). "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'" *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992)).

"The same tests apply to both trademarks and trade dress to determine whether they are protectable and whether they have been infringed, regardless of whether they are registered or unregistered." *Pebble Beach*, 155 F.3d at 536. And neither a trademark nor trade dress is protectable if functional. *Bd. of Supervisors of LA State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 661 (E.D. La. 2006) (citing *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164–65 (1995) and *Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002)), *aff'd sub nom. Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008). Another requirement for protection under the Lanham Act is that registered and unregistered marks be distinctive. *Two Pesos*, 505 U.S. at 768–69. For product design, a showing of secondary meaning is required. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000). Because a trade dress infringement claim brought under Texas common law employs the same rules and standards as a claim under federal law, the Court will analyze them together. *YETI Coolers, LLC v. JDS Indus., Inc.*, 300 F. Supp. 3d 899, 904 n.1 (W.D. Tex.

2018) (citing *Amazing Spaces*, 608 F.3d at 236 n.7 and *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 711 (S.D. Tex. 2009)).

## II.     Tests for Functionality

For trade dress to be protectable under the Lanham Act it must be nonfunctional. *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995) ("It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . . ." (citing 35 U.S.C. §§ 154, 173)). This is because "[i]f a product's functional features could be used as trademarks . . . , a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks [unlike patents] may be renewed in perpetuity)." *Id.* at 164–65.

The primary test for determining functionality, the "traditional test," is "whether the feature is essential to the use or purpose of the product or whether it affects the cost or quality of the product." *Eppendorf*, 289 F.3d at 356 (citing *TrafFix*, 532 U.S. at 32–33). If a feature is the "reason the device works," then it is functional and the "availability of alternative designs is irrelevant." *Id.* at 355 (citing *TrafFix*, 532 U.S. at 33–34). A feature is "essential to the use or purpose of the product if it serves any significant function other than to distinguish a firm's goods or identify their source." *Clearline Technologies Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691 (S.D. Tex. 2013) (quoting *Poly–Am., L.P. v. Stego Indus., L.L.C.*, No. 3:08–CV–2224–G, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011) (citing *Qualitex*, 514 U.S. at 165–66) (internal quotation marks omitted)). "'Essential,' as used in the traditional test of functionality[,] . . . is a term of art, used to distinguish product features that only serve to identify a product's source from those that serve 'any other significant function.'" *Poly-Am.*, 2011 WL 3206687, at *10 (citing *Qualitex*, 514 U .S. at 166).

A secondary test for determining functionality, the "competitive necessity" test, looks to whether "the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Eppendorf*, 289 F.3d at 356. (citation and quotation marks omitted). When applying this test, courts consider "whether the design yields a utilitarian advantage, alternative designs are available in order to avoid hindering competition, and whether the design achieves economies in manufacture or use." *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1288 (Fed. Cir. 2010). However, if a product feature is functional under the traditional test, a court need not address the competitive necessity of the feature. *Eppendorf*, 289 F.3d at 356; *Bd. of Supervisors*, 550 F.3d at 488 (rejecting aesthetic functionality); *see also M3 Girl Designs, LLC v. Blue Brownies, LLC*, No. 3-09-CV-2390-F, 2013 WL 12094183, at *3 (N.D. Tex. Jan. 3, 2013) ("If the asserted trade dress is not functional under the traditional test, then courts in the Fifth Circuit consider whether it is functional under the 'competitive necessity' test.").

A party's trade dress may receive protection over a combination of functional elements that define the trade dress if they are combined in an arbitrary, fanciful, or distinctive fashion. *Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC*, 117 F. Supp. 3d 879, 895 (N.D. Tex. 2015) (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991) *aff'd sub nom. Two Pesos*, 505 U.S. 763); *see also Jenny Yoo Collection, Inc. v. Watters Designs, Inc.*, No. 3:17-CV-3197-M, 2018 WL 3330025, at *3 (N.D. Tex. June 6, 2018) ("Defendants ignore that a particular combination of functional elements may be protected if configured in an 'arbitrary, fanciful, or distinctive' fashion." (citations omitted)). "In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is non-functional." *Clearline*, 948 F. Supp. 2d at 701 (citing *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003)). And as noted

by the court in *TrafFix*, where trade dress involves product design, as is the case here, it "almost invariably serves purposes other than source identification." *TrafFix*, 532 U.S. at 29 (quoting *Wal-Mart*, 529 U.S. at 213). "Unless protected by patent or copyright, functional product features may be copied freely by competitors in the marketplace." *Eppendorf*, 289 F.3d at 355. Accordingly, the issue presented here is not whether the components of Pearson's trademark are functional, but whether the entirety of the mark's features is functional. *YETI*, 300 F. Supp. 3d at 913 (citing *Taco Cabana*, 505 U.S. at 763).

## A. Burden of Proof

Section 32 of the Lanham Act, which applies to registered trademarks, provides that a mark registered on the principal registry is admissible and *prima facie* evidence of its validity "but shall not preclude another person from proving any legal or equitable defense or defect . . . ." 15 U.S.C. § 1115(a). A mark becomes "incontestable" after five years of continuous commercial use. *Id.* § 1065. However, incontestable status does not mean a trademark is indisputable. *Id.* § 1115(b). An incontestable trademark is subject to the nine defenses and defects listed under subsection (b), which includes that the mark is functional. *Id.* § 1115(b)(8). Here, Pearson's mark is not an incontestable trademark because it has not been used for the requisite time. However, a mark that is registered, but has not obtained "incontestable" status, still benefits from the presumption of validity. *RJ Mach. Co. v. Canada Pipeline Accessories Co.*, 116 F. Supp. 3d 795, 808 (W.D. Tex. 2015). And the presumption may be rebutted by evidence that the mark is functional. *Poly-Am.*, 2011 WL 3206687, at *7 (evidence that the trademark holder advertised utilitarian benefits nullified the presumption of validity).

Ackerman may rebut the presumption of validity by introducing evidence that Pearson's registered trademark is functional. If Ackerman rebuts the presumption, Pearson bears the burden

of proving its mark is not functional. *Poly-Am.*, 2011 WL 3206687, at * 7; *See Amazing Spaces*, 608 F.3d at 239 (applying the burden-shifting approach to distinctiveness) (citing *Vision Ctr. v. Opticks*, Inc., 596 F.2d 111, 119 (5th Cir. 1979) ("[T]his presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark." (quotation omitted))).

### B.    Rebutting the presumption of validity

The evidence adduced at trial nullifies the presumption of validity conferred by Pearson's registered mark. First, Pearson admits that every element of its trademark and trade dress serves a functional purpose. Second, Ackerman presented several examples where features of the Pearson mark provided utilitarian, non-reputational advantages such as operability from both a left- and right-handed configuration, ease of use, access, and safety considerations. Third, Pearson advertised the utilitarian benefits of the Pearson Chute, for example, the vertical sides, unobstructed opening and hinging, self-catch gate, ease of operation, and convertible right or left control handle. Finally, Pearson's expired utility patents depict the Pearson mark, claim the frame that is described by the patents, and disclose utilitarian advantages of the Pearson mark.

Although there is no evidence cited by Ackerman to establish there is a cost advantage because of the Pearson design, the Court finds the evidence is sufficient to rebut the presumption of validity of Pearson's mark. Accordingly, Pearson now bears the burden of persuasion to prove its mark is nonfunctional.

### C.    Functionality of Pearson's mark

Under the traditional test, Pearson must establish that the Pearson mark is nonfunctional. *Eppendorf*, 289 F.3d at 355 (citing 15 U.S.C. § 1125(a)(3)). Pearson has failed to meet its burden.

A two-step inquiry is employed to make this determination, which includes assessing (1) the functionality of the individual trademarked features and (2) the overall relationship and

arrangement of those features, because "even if the overall combination of elements is functional, one or more individual parts might still be nonfunctional." 1 *McCarthy on Trademarks and Unfair Competition* § 7:76 (5th ed. 2019). Pearson readily admits that the individual features that comprise the Pearson mark serve a functional purpose, which is not surprising for a product design mark. Pearson instead argues that the size, shape, position, and arrangement relative to each component feature of the mark are nonfunctional and properly registerable.

### 1. Utility Patents

Pearson has a heavy burden to show the combination of features in its trademark is not functional. *TrafFix*, 532 U.S. at 30. ("Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device."). And when analyzing functionality of a trademark, the claims are not the only important sources. A patent's specification revealing the purpose of a design configuration may be equally strong evidence of functionality. *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1375 (Fed. Cir. 2012) (citing *TrafFix*, 532 U.S. at 32–33, 34–35).

The Court finds that Pearson's '629 patent not only discloses functional features of the mark, but also describes many aspects of the mark's overall arrangement. Pearson argues that although the patents call for a frame, they do not specify the arrangement of the Pearson mark. Ackerman does not argue the frame, as described in the patent, is what is actually claimed as the invention. Nor does it need to be as the background and description of the patent provide context to Pearson's reference to the frame. Claims 1 and 2 of the '629 patent disclose a "frame" providing support for the squeeze chute contained within. The frame is described as having a rigid and rectangular base with cylindrical, parallel, and upright rear posts that are connected by upper side

rails to a pair of upright vertical front posts. The rear posts are connected by a crossarm and the front posts are connected by a front crossarm with an attached squeeze arm connected by a rectangular flange. Further, the hinge arms are attached to "tubular" vertical posts that rotate about each of the four vertical posts. Although the Pearson mark describes only which direction the hinge arms extend, the patent further provides that they are parallel, equal in length, and at the same height. Although there are some differences between the patent description and the mark, such as a rectangular versus circular flange, the overall arrangement of the Pearson mark is described in the '629 patent. This conclusion is bolstered by the illustrations disclosed in both the '629 and '206 patents that look substantially similar to the trademark illustration. (*Compare* Pl.s' Exh. 2 at 12 *with* Pl.s' Exh. 2 at 156 and 164).

However, what is important to the functionality analysis is whether the patents disclose utilitarian features of the mark. The Court concludes that the '629 patent discloses utilitarian advantages of the Pearson mark. First, the '629 patent discloses that the raised front crossarm with attached rectangular flange allows the chute to operate from either side when coupled with the squeeze handle. As disclosed in the patent and bolstered by trial testimony, this particular arrangement is a valuable feature enhancing operability of the chute even though it is not claimed. Second, the background of the invention discloses it is important for a chute to be uniform throughout its height so as not to discourage an animal from entering the chute. Thus, the frame that supports the parallel squeeze invention also must comply with this important requirement, thereby dictating the rectangular base and vertical posts upon which the hinges squeeze the chute.

Because the overall arrangement of the Pearson Chute as described in the '629 patent provides utilitarian advantages, Pearson has a heavy burden to prove it is not functional.

As previously stated, Ackerman presented evidence of the Pearson mark's non-reputational advantages. Neidig testified that the combination of the raised front crossbar, circular disks, and squeeze handle promotes leverage and structural integrity, which are inherent to performance. Hull agreed with Neidig and added the Pearson Chute's arrangement makes operating the chute safer. The testimonials provided by Pearson during prosecution of the mark also support utilitarian advantages. For example, Tony Dean's testimonial states the raised crossbar provides "maximum" force in operating the chute; the chute can be operated from either side; the rectangular design provides ample room for just about any size animal; and the overall design is clean without any dangerous protruding bars. (Pl.'s Exh. 2 at 141).

Under the traditional test for functionality, Pearson has the burden to prove the trademark features are not "essential to the use or purpose" or do not affect the "cost or quality" of the Pearson Chute. *See TrafFix*, 532 U.S. at 32. In its post-trial brief, Pearson restates the syllogism from *Taco Cabana* to argue that the "functionality analysis is <u>not</u> '(1) functional elements do not enjoy protection; (2) [the] trade dress includes functional elements; (3) therefore, [the] trade dress does not enjoy protection. [Because] . . . a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" 932 F.2d at 1119 (5th Cir. 1991) (emphasis and alterations added). However, missing from Pearson's briefing and trial presentation is any evidence that the Pearson mark is merely an arbitrary combination of functional features. For example, there is no evidence to suggest that Pearson chose to arrange the Pearson Chute with a raised front crossbar, circular disks, and squeeze handle for any reason other than the chute works better in that configuration. There is no denying the Pearson Chute's configuration

works well to immobilize cattle. But there simply is a dearth of evidence to support the conclusion that the Pearson mark is used to distinguish the cattle chute product from its source.

Although not emphasized at trial, the existence of alternative designs using features of the Pearson mark does not prove Pearson's mark as a whole is nonfunctional. This case is similar to *AMID, Inc. v. Medic Alert Foundation United States, Inc.*, 241 F. Supp. 3d 788 (S.D. Tex. 2017). *AMID* concerned, among other things, the trade dress of a marketing device (an easel display) for medical identification jewelry. *Id.* at 810. The plaintiff argued that its trade dress was nonfunctional because the easel "display could have been designed in thousands of other ways, with elements in infinite combinations." *Id.* at 820 (internal quotation marks omitted). The district court, relying on *Eppendorf* and *TrafFix*, rejected this argument because it ignored the traditional test for functionality, which does not include available alternative designs. *Id.*

Much like in *AMID*, an argument that Pearson Chute's features are used in alternative designs and thus are not functional fails for the same reason. Although *TrafFix* concerned a single functional feature, the dual-spring design, and Pearson's trademark concerns a collection of functional design features, the reasoning in *TrafFix* applies here with equal weight. Just because the features of Pearson's trademark may be arranged in a number of ways to produce a different cattle chute, that fact does not prove Pearson's design was some "arbitrary flourish." *TrafFix*, 532 U.S. at 34; *Kodiak Prod. Co. v. Tie Down, Inc.*, No. CIV.A.4:03-CV-1474-Y, 2004 WL 2599353, at *5 (N.D. Tex. Nov. 12, 2004) ("Simply because a manufacturer can achieve the same result through an alternative method does not show that a particular product feature is non-functional."). Moreover, merely showing that alternative designs employ some of the features of the Pearson mark, without more, is not evidence proving the Pearson Chute's design is arranged for any purpose other than its function. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002)

(foreclosing a finding of non-functionality where "the whole is nothing other than the assemblage of functional parts.").

In summary, under the traditional test for functionality, Pearson has failed to show that the Pearson Chute features are not "essential to the use or purpose" of the trade dress and do not affect the "cost or quality" of the trade dress. *See TrafFix*, 532 U.S. at 32. There is evidence of functionality because Pearson's expired '629 utility patent, while not claiming all the features of Pearson's mark, does disclose nearly every feature and describes utilitarian advantages of the mark, supporting a finding of functionality. Further, trial testimony described the Pearson mark's utilitarian advantages of operability and safety. Finally, the record does not support a conclusion that the design is not essential to the way the cattle chute functions. Indeed, trial testimony and advertising materials and testimonials submitted to the PTO prove that Pearson arranged the functional features of its cattle chute to make the chute work better.

Nor can Pearson argue the mark's features as a whole are nonfunctional. Pearson did not direct the Court to any evidence or testimony proving its design is configured in an arbitrary, fanciful, or distinctive way or intended to identify its source. To the contrary, there is evidence proving Pearson's mark serves a functional purpose that is not aimed at identifying the source of the cattle chute. *Clearline*, 948 F. Supp. 2d at 701 ("[W]here individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is non-functional."); *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) ("[W]here the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional.").

Because Pearson has not met its burden under the traditional test for functionality, the Court need not analyze functionality under the competitive necessity test. Accordingly, Pearson's mark is functional and therefore is not protectable.

## III.    Distinctiveness

For product design, the Supreme Court has held that an action for infringement of unregistered trade dress requires a showing of secondary meaning. *Wal-Mart*, 529 U.S. at 216. Neither party claims that the Pearson mark is capable of inherent distinctiveness as product design trade dress or that the Pearson mark is closer to product packaging trade dress. Even so, in close cases where trade dress falls between product packaging or design, courts "should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215. Here, the Pearson Chute is squarely a product design as Pearson has argued that the arrangement of the chute's functional features is protectable as a mark. Accordingly, the Court follows the Supreme Court's guidance and finds that for Pearson to prevail on its infringement claims, Pearson must show the mark has acquired secondary meaning.

Although the Pearson mark is not protectable because it is functional, the Court addresses whether the mark acquired secondary meaning and is therefore distinctive. Neither party contests Pearson is trying to enforce its registered trademark. However, it is unclear what rights Pearson is claiming under its unregistered trade dress. "Without . . . a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market" or to "shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *AMID*, 241 F. Supp. 3d at 806 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). But throughout litigation of this case, at trial, and in the

parties' post-trial briefing, Pearson's registered trademark and trade dress are one and the same. Accordingly, the Court will analyze the distinctiveness of Pearson's trademark and trade dress together.

Pearson argues in its post-trial brief that its mark is presumptively distinctive because it is registered. (ECF No. 154 at 2). However, the presumption does not look back in time to before the mark was registered. *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1118 (Fed. Cir. 2018); 2 *McCarthy* § 11:43 ("The presumption to which a § 2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration."). And the same burden-shifting analysis as discussed for functionality also applies to whether a mark has acquired secondary meaning. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005) ("Registration is *prima facie* proof that the registered mark is distinctive. However, this presumption can be overcome by showing that the mark is merely descriptive. The burden then shifts to the registrant to prove that its mark has secondary meaning."). In the Fifth Circuit, Ackerman's burden is one of production. *Amazing Spaces*, 608 F.3d at 239 ("[I]introduction of evidence that the [mark] is not distinctive has reduced the presumption of validity to evidence that the PTO is of the opinion that the [mark] is sufficiently distinctive to be legally protectable as a mark."). Ackerman's post-trial brief does not mention the presumption conferred by registration of the Pearson mark. Ackerman, however, does discuss whether the mark has acquired secondary meaning.

The Court finds Ackerman has met his burden of production. At trial, Ackerman focused much of his attention on the multiple versions of the Pearson Chute marketed and sold by Pearson since 1970. Ackerman showed how the Pearson Chute's design had evolved over the years, but has remained substantially unchanged in commerce since 1993, after Pearson implemented

circular disks to support actuation of the squeeze handle. He also presented evidence of other cattle chutes using features of Pearson's mark after expiration of its patents, such as the 2W Wrangler in the 1990s and the WW Stampede in the 2000s, not to mention Ackerman's substantial use of the Pearson mark since 2014. Although rebutting the presumption for distinctiveness is not required for the period when the Pearson mark was unregistered, the Court finds Ackerman has met his burden of production in rebutting the presumption of distinctiveness for the period after the mark was registered. Thus, Pearson must prove that the mark has acquired distinctiveness through secondary meaning.

Secondary meaning occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Bd. of Supervisors*, 550 F.3d at 476 (quoting *Wal-Mart Stores*, 529 U.S. at 211). The burden of demonstrating secondary meaning "is substantial and requires a high degree of proof." *Test Masters*, 428 F.3d at 567. "Because the primary element of secondary meaning is a mental association in buyer[s'] minds between the alleged mark and a single source of the product, the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Amazing Spaces*, 608 F.3d at 248 (quotation omitted). The Fifth Circuit employs the following seven factors to determine whether a mark has acquired secondary meaning: "(1) length and manner of the use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress." *Bd. of Supervisors*, 550 F.3d at 476. These "factors in combination may show that" a mark has acquired secondary meaning "even if each factor alone would not." *Id.*

The evidence presented at trial does not prove that Pearson's mark has acquired secondary meaning. It is not clear when Pearson began advertising and selling the claimed mark. However, the evidence shows that the Pearson Chute design has remained unchanged since 1993. Although Ricky Rater testified about Pearson's annual sales volume, there is no evidence to establish how many Pearson Chutes have been sold in connection with the mark. He also testified the Pearson Chute is promoted on Pearson's website, in print, and at trade shows, but there is little evidence to establish the extent of the advertisement, not to mention its effectiveness in promoting Pearson as a source identifier. Nor did Pearson offer evidence of advertising by its distribution network or its regional distributors and dealers who themselves market Pearson Chutes at trade shows, in print, and online. Although the few print advertisements in the trademark prosecution file show the Pearson mark prominently displayed, they also show how the Pearson mark has changed over time, particularly with respect to the circular disks and rear squeeze hinges. Further, the advertisements do not describe or emphasize the Pearson mark as being distinctive, focusing instead on utilitarian advantages of the chute. These factors weigh against a claim of distinctiveness.

Further, there is no consumer survey evidence to establish the public's perception of the Pearson mark. *Amazing Spaces*, 608 F.3d at 248 ("We have consistently expressed a preference for an objective survey of the public's perception of the mark at issue." (internal quotation marks and citations omitted)). Although the testimonials presented to the PTO and testimony at trial indicate that color, raised front crossbar, squeeze handle, removable side panels, and circular disks are all identifiable features, no empirical studies prove the impact of them, and the testimonials stress different aspects of these features so it is unclear whether as a whole or individually what features make the Pearson Chute distinctive. For example, Hull indicated he could recognize a Pearson Chute from 300 yards away, noting the raised crossbar and circular disks, but he also

testified that the gray color of the chute is distinctive to Pearson. His testimonial to the PTO also indicated that the tall head gate, clean lines, parallel squeeze, rectangular design, and Pearson's gray powder-coat paint color set the Pearson Chute apart from other chutes. (Pl.'s Exh. 2 at 144). Moreover, Hull was the only consumer who testified at trial about the Pearson Chute's features. In sum, because the consumer evidence in the record is inconclusive as to whether the Pearson mark has acquired secondary meaning, the lack of consumer survey evidence creates an insurmountable burden for Pearson. *See Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) (finding the evidence of secondary meaning unpersuasive absent objective survey evidence when only seven consumers testified that the word mark identified the business).

As for intentional copying, there is no dispute that Ackerman helped develop and sold chutes using the Pearson mark. The question though is if Ackerman intended to copy features of the Pearson mark to appropriate Pearson's goodwill. Generally, "evidence of intentional copying shows the strong secondary meaning of [a product] because 'there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *AMID*, 241 F. Supp. 3d at 818 (quoting *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (internal quotation omitted)). But courts also recognize that "evidence of a defendant's intent to copy is more relevant to the infringement analysis than the protection analysis." *Id.* (quoting *Berg v. Symons*, 393 F. Supp. 2d 525, 554 (S.D. Tex. 2005) (citing *Sno–Wizard Mfg., Inc. v. Eisemann Prod. Co.*, 791 F.2d 423, 428 (5th Cir. 1986) and *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989))).

Although Pearson presented no direct evidence that Ackerman intended to copy the Pearson Chute to pawn off its goodwill as his own, Pearson presented circumstantial evidence of Ackerman's intent. Having been a Pearson distributor since 1993, Ackerman knew the Pearson

Chute was a popular, high quality, and comparatively expensive cattle chute. He helped WW design a lower priced chute implementing features of the Pearson mark, such as the circular disks and removable side panels. Soon after Pearson terminated Ackerman as its distributor for sending a Pearson Chute to WW, he sought out Pro Farm to continue developing a more economical chute, which became the Renegade. Both the Renegade and Beefmaster incorporate the overall look of the Pearson mark. Ackerman counters that he only intended to copy features of Pearson's mark because of their functionality, which is somewhat bolstered by Carhart. He also stated that because other manufacturers had copied the Pearson design after Pearson's patents expired, it was acceptable for him to do likewise. Further, Ackerman began producing the Renegade in 2014, but Pearson did not initiate suit and demand Ackerman stop selling the Renegade until after the Pearson mark was registered. Under these circumstances and considering the credibility of the witnesses, this factor weighs in favor of secondary meaning, but the probative value is limited by Pearson's delay in notifying Ackerman he was infringing. Moreover, because the Court finds that the Pearson mark is functional, Ackerman's claim he intended to copy only the functional elements lessens the impact of this factor as there is a logical reason for Ackerman's copy.

Overall, the paucity of evidence in the record weighs against a finding of secondary meaning. There is no evidence of the volume of Pearson's sales or the amount of its advertising, and there is only a cursory sampling of brochures depicting various versions of Pearson Chutes. Although Pearson has sold a form of the Pearson Chute since 1970, the design has changed through the years. There is evidence that the post-1993 Pearson Chute incorporates all of the features of the Pearson mark. But long-term use without evidence that the consuming public associates the mark with Pearson is of diminished probative value. *Bank of Texas v. Commerce Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (disavowing length of time alone as sufficient to establish secondary

meaning). Further, the lack of consumer testimony in light of the absence of consumer survey evidence, does not weigh in favor of a finding of secondary meaning. Finally, even though Ackerman copied aspects of the Pearson mark, weighing in favor of secondary meaning, the Court is unpersuaded given the totality of the evidence and credibility of the witnesses that the Pearson mark had acquired secondary meaning. Accordingly, the Court finds the Pearson mark is not distinctive and therefore is not protectable.

## IV. Statutory Trade Dress Dilution and Texas Common Law Trade Dress Infringement

Pearson also sued Ackerman for trade dress dilution under Texas' anti-dilution statute and trade dress infringement under Texas common law.

As mentioned previously, the standard for trade dress infringement under the Lanham Act and Texas common law are essentially the same. *Amazing Spaces*, 608 F.3d at 235 n.7; *KLN Steel Products Co., Ltd. v. CNA Ins. Companies*, 278 S.W.3d 429, 440–41 (Tex. App.—San Antonio 2008, pet. denied) (looking to the Lanham Act for the meaning of trade dress infringement under Texas law). Because Pearson's claim for trademark and trade dress infringement fail under federal law so too does its infringement claim fail under Texas common law.

Pearson's anti-dilution claim fails for the same reasons as its trademark and trade dress claims. Under Texas law, "the owner of a mark that is famous and distinctive . . . in this state is entitled to enjoin another person's commercial use of a mark . . . if use of the mark . . . is likely to cause the dilution of the famous mark." Tex. Bus. & Com. Code Ann. § 16.103(a) (West Supp. 2018). A mark is famous under Texas law

> if the mark is widely recognized by the public throughout this state or in a geographic area in this state as a designation of source of the goods or services of the mark's owner. In determining whether a mark is famous, a court may consider factors including:

(1) the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party;

(2) the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state;

(3) the extent of actual recognition of the mark in this state; and

(4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

*Id.* § 16.103(b). As with Pearson's infringement claim, there is not sufficient evidence to prove Pearson's mark is distinctive, much less famous. There is little to no evidence of Pearson's marketing efforts, sales volume, or recognition of the Pearson mark in Texas. The Court concludes Pearson has not met its burden of proof that the mark is famous. Therefore, Pearson's dilution claim is unsupported.

## V.     Fraudulent Procurement of a Trademark

Finally, Ackerman counterclaims that Pearson's trademark should be canceled because Pearson fraudulently procured the trademark with the sole purpose of seeking a cause of action against Ackerman. Ackerman claims Rickey Rater made false representations to the PTO that if disclosed would have resulted in rejection of Pearson's trademark.

The elements of fraudulent procurement of a trademark are: (1) a false representation of a material fact; (2) knowledge or belief that the representation is false; (3) intent to induce the PTO to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance by the PTO on the misrepresentation; and (5) damage from such reliance. *Texas Pig Stands, Inc. v. Hard Rock Café Int'l.*, 951 F.2d 684, 693 n.14 (5th Cir. 1992). To prevail, Ackerman must prove by clear and convincing evidence that Pearson made false statements with the intent to deceive the PTO. *Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir. 1993). This is a heavy

43

burden to satisfy. *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 644 (N.D. Tex. 2009) ("The moving party bears a heavy burden in proving fraud in the procurement of a registration."). Because there is rarely direct evidence of an intent to deceive, it may be inferred from indirect or circumstantial evidence. *In re Bose*, 580 F.3d 1240, 1245 (Fed. Cir. 2009).

Ackerman asserts that Ricky Rater knew his statements that Pearson's use of the mark was exclusive and continuous from 1973 were false and material to the Examiner. As for continuous use of the Pearson mark, the evidence shows that Pearson used the mark at least since 1993. However, Pearson's trademark application was submitted under Section 2(f), which requires "proof of substantially exclusive and continuous use" of a "mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052. Pearson filed its trademark application in 2014. Because Pearson has used the mark in commerce since 1993, the alleged misstatement that Pearson's first use was in 1973 is immaterial and cannot support a finding of fraud. The PTO has long held that an erroneous date of first use does not constitute fraud so long as there is valid use of the mark before the relevant time. *Brewery v. Brewery*, 17 U.S.P.Q.2d 1137 (T.T.A.B. 1990).

Ricky Rater's use of the term "exclusive" also does not warrant a finding of fraudulent procurement. Although his declaration used the term "exclusive" concerning Pearson's use of the mark, the declaration also informed the Examiner that the mark had recently been the subject of copying. And earlier in the prosecution of the trademark, Pearson referred to Ackerman's website as evidence of copying. The Examiner even acknowledged Ackerman's website depicting the Renegade and other similar cattle chutes as evidence of functionality. Thus, the Examiner knew about other cattle chutes that looked like the Pearson mark.

Professor McKenna testified that the only new evidence presented to the PTO upon reconsideration was Pearson's brief containing Ricky Rater's declaration, which focused on intentional copying by Ackerman. According to Professor McKenna, Pearson's new evidence was the only reason why the Examiner could have issued the trademark. The Court does not accept this characterization and conclusion. A review of the trademark prosecution file shows Pearson's brief on reconsideration contained not only arguments and statements concerning Ackerman's copying but also much more thorough and detailed arguments related to functionality, as the brief discussed the utility patents and the *Morton-Norwich* factors. The Examiner could have issued the trademark based on Pearson's more persuasive arguments concerning functionality instead of statements made about intentional copying. Under these circumstances, even if Ricky Rater's statements concerning Ackerman's intentional copying were false, the evidence did not establish he did so with the intent to deceive the Examiner or that the PTO necessarily relied on these statements in issuing the trademark.

Ackerman contends that because Ricky Rater did not have personal knowledge of Ackerman's intent to copy the Pearson Chute or to use Pearson's goodwill, the statements were material misrepresentations showing an intent to deceive. Ackerman attempts to bolster this argument with Professor McKenna's testimony that David Rater was the proper person to have made the declaration. Assuming *arguendo* that Ricky Rater's statement were false, Ackerman has not proven by clear and convincing evidence Pearson's intent to deceive. First, Ackerman's post-trial brief has cited to no case law where a court found fraudulent procurement on facts similar to this case. Second, Ricky Rater signed the declaration on behalf of Pearson, Inc. He testified that he discussed the matter with David Rater who directly communicated with Ackerman and investigated the statements made in the declaration. Under these circumstances and considering

Ricky Rater's position in the company as Vice President and General Manager, the contents of the declaration were within his sphere of responsibility. The Court does not find fraud in this context. *See DIRECTV, Inc. v. Budden,* 420 F.3d 521, 530 (5th Cir. 2005) (declining to find a summary judgment affiant lacked personal knowledge when it can be reasonably inferred from a corporate employees' position and participation in the matter).

Although Ricky Rater may not have had actual knowledge of Ackerman's intent to copy the Pearson Chute design, there is circumstantial evidence indicating the Renegade was designed to imitate it while minimizing manufacturing costs. "There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive." *In re Bose*, 580 F.3d at 1246. On these facts, there is no clear and convincing evidence establishing Pearson fraudulently procured its trademark.

## VI.    Trademark Cancellation

Ackerman requests that Pearson's trademark registration be canceled pursuant to 15 U.S.C. § 1119. Under Section 1119, federal courts have the power to order the cancellation of registrations "[i]n any action involving a registered mark." 15 U.S.C. § 1119; *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 547 (5th Cir. 2015). Because the Court has concluded Pearson's mark is functional and not distinctive, the PTO shall cancel Pearson's registration to prevent further litigation regarding this action. *See* 15 U.S.C. § 1064(3).

## VII.    Ackerman's Defenses

In his Answer to Pearson's Original Complaint, Ackerman asserted laches, unclean hands, equitable estoppel, acquiescence and fair use as defenses. (ECF No. 12 at 14–17). As the court has determined that Pearson has failed to establish by a preponderance of evidence its claims for trademark and trade dress infringement under the Lanham Act, trade dress infringement under

Texas common law, and statutory dilution under the Texas Business and Commerce Code, Ackerman's defenses are moot, and the court will not discuss them. In the event that they are not moot, the Court finds that Ackerman did not prove any of such defenses by a preponderance of the evidence.

## VIII.   Exceptional Case

Ackerman has requested the Court to find this case is "exceptional" under the Lanham Act and award him reasonable attorney's fees as the prevailing party. The Court denies the request. Under Section 1117 of the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." "[A]n exceptional case is one where (1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an "unreasonable manner." *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016). Courts determine whether a case is exceptional on a case-by-case basis and after considering the totality of the circumstances. *Id.* There can be no dispute that Ackerman is the prevailing party as the Court has ordered the PTO to cancel Pearson's registered mark. However, Pearson's litigation position and actions during the case do no warrant an exceptional case finding.

Pearson's litigation position was not so weak as to warrant an award of attorney's fees in favor of Ackerman. Pearson sued Ackerman for trade dress and trademark infringement after obtaining trademark registration from the PTO. As stated above, registration confers a presumption of validity over the mark. Although Pearson's position ultimately failed notwithstanding the presumption, Pearson should not be faulted for relying on the registration to enforce its rights. Thus, the Court finds Pearson's position was not exceptionally weak under the circumstances.

Nor did Pearson litigate the case in an unreasonable manner. Although Pearson knew Ackerman was selling potentially infringing cattle chutes three years before filing suit, this is not so long as to warrant an award of attorney's fees, as the evidence shows Pearson began prosecuting its trademark shortly after terminating Ackerman's distributorship. Further, as discussed above, Ackerman failed to prove that Pearson fraudulently procured the trademark. Moreover, although discovery in this case was at times contentious, it was not so one-sided and Pearson's actions so objectively unreasonable as to find an award of attorney's fee is warranted.

Having considered the strength of Pearson's claims and actions litigating the case, and after reviewing the evidence and the totality of the circumstances, the Court finds that the case is not exceptional. Accordingly, Ackerman's request for attorney's fees is denied.

## CONCLUSION

For these reasons, Pearson is not entitled to recover on its claims for trademark and trade dress infringement under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*., trade dress dilution under Section 16.103 of the Texas Business and Commerce Code, and Texas common law trade dress infringement. Further, because Pearson's trademark is not protectable, the Court, pursuant to 15 U.S.C. § 1119, orders the Director of the United States Patent and Trademark Office to cancel Pearson's Inc.'s trademark registration No. 5,184,202, which was registered on April 18, 2017. Ackerman's request for attorney's fees is denied.

**Signed** on July 29, 2019.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE